IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANGUS R. FINLAY, Plaintiff–counter-defendant, | ) | Civil Action No.: 10 C 5622 |
| v. | ) | |
| BEAM GLOBAL SPIRITS & WINE, INC., Defendant–counter-plaintiff. | ) | Suzanne B. Conlon, Judge |

**MEMORANDUM OPINION AND ORDER ON REVIEW OF ADMINISTRATIVE DENIAL OF SEVERANCE BENEFITS**

Angus Finlay was a marketing director for Beam Global Spirits & Wine, Inc. from 2007 until he left the company in 2009. Upon his separation, he received severance pay under an executive severance plan. Beam terminated Finlay's severance plan participation and demanded return of previous payments because of Finlay's conduct for "cause" under the severance plan. Beam was defending a discrimination suit in the United Kingdom by a former employee who had worked under Finlay. Beam sought a witness statement from Finlay, but he refused. Finlay asserted the purported facts in the statement prepared by Beam were untrue; Beam insisted the facts were based on Finlay's previous statements to its top management about the UK employee's unwillingness to relocate in the United States when the company was undergoing a reorganization. As a result of Finlay's information, the company did not offer her a similar executive position in the United States when the UK position was terminated. Beam stopped

Finlay's severance payments due to his refusal to cooperate in the defense of the UK case.

Finlay claims the termination of his severance payments violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* In addition he claims retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Beam counterclaims for return of its severance payments under ERISA and for breach of contract. Beam moves for summary judgment on the Title VII claim and for judgment on the administrative record on the ERISA claim and counterclaim. The ERISA claims are addressed here; the Title VII claim is addressed in a separate opinion.

## I. Relevant Evidence

In reviewing the denial of ERISA benefits under 29 U.S.C. § 1132(a)(1)(B), the court is generally limited to consideration of the administrative record. *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 482–83 (7th Cir. 2009). Evidence beyond the record may be considered concerning a conflict of interest, misconduct, or bias on the part of the decisionmaker. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115–19 (2008); *Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 814–15 (7th Cir. 2006). But allowing new evidence not in the administrative record on a conflict of interest claim does not open the gates to any and all evidence to challenge the administrative findings. *Semien*, 436 F.3d at 814–15. Rather, the administrative findings are examined on the basis of the administrative record. Outside evidence concerning a possible conflict of interest may be one factor to weigh in determining whether the administrative decision should stand under the applicable standard of review. *Glenn*, 554 U.S. at 117; *see Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758 (7th Cir. 2010) (discussing administrative record before turning to conflict of interest).

Finlay does not limit his response to Beam's Rule 56.1 statements to evidence in the

administrative record. For example, in disputing ¶ 14 of Beam's Rule 56.1 statements, Finlay cites:

> Finlay's Rule 56.1(b)(3)(C) Statement, at Pars. 8, 18-21, 23 and 27 below; Finlay Dep. at 31, 33, 35, 39; Newlands Dep. at 29-31, 35-41, 44-45, 55, 56; Strehle Dep. at 38-39, 84; Shattock Dep. at 38-40; Pramberger Dep. at 18-19, 25-26, 33-34, 44, 58-59, 66-68, 125; Weitz Dep. at 11-13, 15-16; MacKenzie Dep. at 46-47, 49-53, 62; Plaintiff's Deposition Exhibits 1; 29; 39 at 000136, 139-40; 44 at 00209; 46 at 000228; 47 at 000246; 48 at 000286.

Pl. Resp. to Def. Facts ¶ 14. This is improper for two reasons. First, Local Rule 56.1(b)(3) requires citation to evidence; citation merely to a party's own statement of facts is insufficient. *See Sandefur v. Vill. of Hanover Park*, – F. Supp. 2d –, No. 10 C 5851, 2012 WL 1889791, at *1 n.1 (N.D. Ill. May 25, 2012) (reminding parties "they must cite to the record to support a Local Rule 56.1(b)(3) denial"). Second, it is unclear whether any of the cited evidence was before the plan administrator. The depositions—taken for discovery on the Title VII claim—certainly were not part of the administrative record. Accordingly, discovery citations cannot be considered. Finlay's objections to several of Beam's Rule 56.1 statements that "[t]he other portions of this statement are not supported by the portions of the record cited to by Beam" are overruled. The record citations in each instance adequately support the facts in each contested statement. Finally, Finlay contends the proceedings before the UK tribunal were not part of the record of his administrative appeal. He cites no evidence to contradict the affidavit of Beam's senior vice president and chief human resources officer that the attached UK tribunal record is a complete and authentic set of the materials considered in the administrative proceedings. Accordingly, all Beam's Rule 56.1 statements are deemed true.

Beam also makes missteps concerning Finlay's Rule 56.1 additional statements of fact.

Beam disputes many of Finlay's facts by stating that he "improperly cited to materials that are not part of the administrative record." However, Beam fails to consider that discovery sometimes is permissible in ERISA cases when a conflict of interest may be an issue. *Semien*, 436 F.3d at 814–15. Many of Finlay's Rule 56.1 statements concern a potential conflict of interest and bias on the part of the plan administrator who made the final decision on benefits. Finlay posits a potential conflict of interest: to find in Finlay's favor, the plan administrator might have to contradict Beam's position in defending the UK lawsuit. It is unclear whether Finlay has made a sufficient showing to require discovery on administrative review. *Compare Allen v. HSBC-N. Am. (U.S.) Ret. Income Plan*, No. 09 CV 5713, 2010 WL 3404966, at *3–4 (N.D. Ill. Aug. 24, 2010) (Keys, Mag. J.) (*Semien*'s requirement of exceptional showing before obtaining discovery still controls after *Glenn*), *with Baxter v. Sun Life Assurance Co. of Canada*, 713 F. Supp. 2d 766, 770–74 (N.D. Ill. May 20, 2010) (Dow, J.) (concluding limited discovery must be allowed "for the Supreme Court's decision in *Glenn* to be meaningful"). Here, the court considers outside evidence on the conflict of interest.[1] But evidence beyond the administrative record that purports to contradict the findings of the Employee Benefits Committee or the plan administrator is not considered. Accordingly, Finlay's statements of additional fact using outside evidence to contradict facts are disregarded; but those relating to the conflict of interest are considered.

---

[1] Both parties can be faulted for not raising this issue before the dispositive motions were filed. Beam is correct that, in the usual ERISA administrative review case, a plaintiff must move for permission to take discovery. *See, e.g.*, *Semien*, 436 F.3d at 814–15 (instructing courts to monitor discovery in ERISA cases closely). Had Finlay done so in this case, the permissible boundaries of outside evidence would be clear. However, Finlay went ahead and conducted discovery on the ERISA claim at the same time as he conducted discovery on the accompanying Title VII claim. On the other hand, Beam could have moved for a protective order during discovery, barring Finlay from certain avenues of inquiry and clarifying discovery relevant to only the ERISA claim.

## II. Background

Finlay was Beam's senior vice president and chief marketing officer from January 2007 through October 2009. Def. Facts ¶ 5. He reported directly to Beam's CEO. *Id.* When he left Beam, he was eligible under the executive severance plan to receive up to $728,184 in severance payments over the next eighteen months. *Id.* ¶¶ 6–7.

The severance plan is administered by Beam, and it "reserves absolute discretionary authority to determine all matters arising in connection with the administration, interpretation and application of this Severance Plan, including all questions of coverage, facts, eligibility and methods of providing and arranging for any benefits." Def. Facts ¶ 9. The severance plan explicitly states that benefits will be paid "only if the Plan Administrator decides in its absolute discretion that an Employee is entitled to them." *Id.* The discretion of the plan administrator is delegated to the Employee Benefits Committee, the entity tasked with deciding employee claims for severance benefits. *Id.* ¶ 12. If a denied claim is appealed, the senior vice president of human resources has the full discretion as the plan administrator to decide the appeal. *Id.* ¶ 13.

The severance plan contains a forfeiture provision. Def. Facts ¶ 10. The plan gives Beam the right to stop payments if it later "discovers information that, in the Employer's reasonable judgment, would have provided a basis for termination of the Employee for cause (as defined in 2(A)(1) of this Plan)." *Id.* Cause "includes but is not limited to misconduct, negligence, dishonesty, criminal act, excessive absenteeism, and willful failure to perform job responsibilities and other conduct determined by the Employer to be 'cause.'" *Id.* ¶ 11. If Beam determines cause exists, it may not only stop payment, but also may recover severance payments already made and attorney's fees incurred to collect the already-paid amount. *Id.* ¶ 10.

Finlay was the direct supervisor and personal mentor of Anne Cyron, a Beam employee and resident of the United Kingdom. Def. Facts ¶¶ 14–15. She reported directly to Finlay for most of her Beam career. *Id.* ¶ 16. In 2008, Cyron was appointed Senior Director in charge of Beam's DeKuyper brand. *Id.* ¶ 18. DeKuyper was marketed and sold almost exclusively in the United States. *Id.* ¶ 19. In the past, the DeKuyper brand had always been managed by a person living in the United States, operating out of Beam's headquarters in Deerfield, Illinois. *Id.* ¶ 20. The choice of Cyron to work on DeKuyper was made with some reluctance because she lived in the United Kingdom. *Id.* ¶ 21. During her tenure, Beam's Executive Leadership Team discussed several times the need for the person in Cyron's position to be located in the United States. *Id.* ¶ 22. Finlay was included in most of the meetings where the issue was discussed. *Id.* At other meetings, where he was not present, information Finlay provided about Cyron was discussed. *Id.* Finlay repeatedly told Beam senior management that Cyron would not relocate to the United States. *Id.* ¶ 23.

In 2009, Beam began a major restructuring. Def. Facts ¶ 24. The DeKuyper brand was central to restructuring; a key strategic priority was addressing the falling volume and profits of the DeKuyper brand in the United States. *Id.* Beam decided the head of the DeKuyper brand had to be located in the United States and work from Deerfield. *Id.* ¶ 26. Cyron was discussed in talent reviews regarding the restructuring. *Id.* ¶ 27. Beam decided not to offer Cyron a continued DeKuyper brand chief position based on Finlay's representations that she was unable or unwilling to relocate to the United States. *Id.*

Cyron was informed of her impending termination in an October 8, 2009 meeting with Tom Strehle, vice president for human resources, and Bill Newlands, Beam's US president. Def.

Facts ¶ 28. Newlands explained to Cyron that her termination was driven by the fact that her position needed to be located in the United States and that he understood she was unwilling to relocate to Deerfield. *Id.* ¶ 29. Newlands told her that Finlay had said several times that she was unable and unwilling to relocate to the United States. *Id.* Cyron nodded acknowledgment and made no comments to the contrary. *Id.*

Cyron filed a claim in the United Kingdom alleging her termination was discriminatory. Def. Facts ¶ 30. She claimed Beam did not perform its redundancy consultation obligations under UK law by failing to consider her for relocation to the United States before deciding to terminate her employment. *Id.* ¶ 31. In defending against her lawsuit, Beam obtained witness statements from several Beam executives, stating, in part, that Finlay told them repeatedly that Cyron was unable or unwilling to relocate to the United States. The statements were by Newlands, Beam's US president, Florence Pramberger, senior vice president of human resources at the time of the restructuring, and Matthew Shattock, Beam's president and CEO. *Id.* ¶¶ 33–35.

Beam sought a witness statement from Finlay to confirm that he told Beam senior management that Cyron would not relocate to the United States. Def. Facts ¶ 35. Beam sent him a draft statement to sign, but Finlay contended there were factual errors in the statement and he refused to sign it. *Id.* Finlay denied that he told Beam senior management that Cyron would not relocate to the United States. *Id.* After exchanging correspondence, US human resources chief Tom Strehle sent Finlay a revised witness statement, which he still refused to sign. *Id.* Finlay continued to deny that he was the source of the company's belief that Cyron would not relocate to the United States or that he had in fact discussed relocation with Cyron. *Id.*

On April 13, 2010, a few months after communication about the witness statement broke

down, Beam applied to have Finlay joined as a respondent in Cyron's lawsuit. Def. Facts ¶ 36. Beam contended that if Cyron's claim was valid, then Finlay was the one responsible for the alleged discrimination because he was the source for Beam's belief that Cyron would not relocate to the United States. *Id* The UK tribunal allowed the joinder, rejecting Finlay's arguments to the contrary and finding that if Beam relied on Finlay's statements, he may be liable for discrimination. Finlay's attempts to have that decision overturned on review were unsuccessful. *Id.* ¶¶ 38–40. The UK tribunal found that Finlay admitted he formed the impression that Cyron would not relocate and there was evidence that he communicated this view to colleagues and management. *Id.* ¶ 41.

On April 14, 2010, Beam informed Finlay that his severance benefits were terminated and demanded refund of already-paid severance benefits. Def. Facts ¶ 42. At that point, Finlay had received $506,000 in benefits, $372,973 of which was under the severance plan. *Id.* ¶ 43. After his severance benefits were terminated, Finlay sent Beam a letter purporting to "appeal" the denial of benefits. *Id.* ¶ 44. Beam and the plan administrator construed Finlay's June 4, 2010 letter as a claim for benefits under the severance plan, not as an appeal, because Finlay had not yet filed a written claim for benefits under the plan, a necessary prerequisite to filing an appeal. *Id.* ¶ 45.

The Employee Benefits Committee convened on August 26, 2010 to consider Finlay's claim and related evidence. Def. Facts ¶ 46. The committee was chaired by Mindy MacKenzie, senior vice president of human resources, acting as plan administrator. *Id.* The committee denied Finlay's claim for benefits and issued a written decision on September 9, 2010. *Id.* ¶ 47. The committee unanimously found four grounds that it considered to be "cause" under the plan:

(1) Finlay's conduct gave rise to Anne Cyron's discrimination claim against Beam

in the United Kingdom;

(2) Finlay's failure to formally discuss relocation with Cyron, if true, constituted willful failure to perform his job duties under the circumstances;

(3) Finlay failed to cooperate in the Anne Cyron litigation; and

(4) Finlay was dishonest with Beam regarding his prior statements about Cyron's ability to relocate.

*Id.* ¶¶ 48, 50. The committee determined any of the grounds on its own constituted sufficient grounds to terminate Finlay's severance benefits. *Id.* ¶ 49. The written denial included a detailed explanation of its rationale for denying his claim and notified him of his rights under the plan to appeal and to review relevant documents. *Id.* ¶ 51.

Finlay submitted an appeal on November 3, 2010. Def. Facts ¶ 52. The appeal included a detailed letter from his attorneys and 162 pages of supporting exhibits. *Id.* Finlay's appeal was reviewed by MacKenzie, the designated plan administrator. *Id.* ¶ 53. She reviewed Finlay's submissions and concluded the appeal should be denied. *Id.* ¶ 54. MacKenzie issued a letter on February 28, 2011, denying Finlay's appeal. *Id.* ¶ 55. She addressed the arguments raised by Finlay and identified evidence in the administrative record rebutting each of Finlay's arguments. *Id.*

## III. Analysis

At summary judgment, all genuine disputes are resolved in Finlay's favor He receives the benefit of all reasonable inferences. *Edwards v. Briggs & Stratton Ret. Plan*, 639 F.3d 355, 359 (7th Cir. 2011). (However, Finlay's failure to properly dispute Beam's facts leaves very few disputes to resolve in his favor.) Judgment for Beam is appropriate if the record evidence reveals there are no disputed material facts for trial and establishes Beam is entitled to judgment as a

matter of law. FED. R. CIV. P. 56(a); *Sellers v. Zurich Am. Ins. Co.*, 627 F.3d 627, 631 (7th Cir. 2010).

Because the severance plan gives the plan administrator absolute discretion to make benefits decisions, her decision is reviewed under an arbitrary and capricious standard. *Weitzenkamp v. Unum Life Ins. Co. of Am.*, 661 F.3d 323, 329 (7th Cir. 2011). The court reviews the decision for reasonableness and looks to whether the plan administrator gave Finlay specific reasons for its decision, whether Finlay had an opportunity for full and fair review, and whether "there is an absence of reasoning to support the plan administrator's determination." *Frye v. Thompson Steel Co., Inc.*, 657 F.3d 488, 492–93 (7th Cir. 2011) (internal quotation marks and citation omitted). When deciding an ERISA case at summary judgment under the arbitrary and capricious standard, the court must consider whether "when taken in the light most favorable to [Finlay], there is no evidence [Beam's] denial of benefits was arbitrary and capricious." *Semien*, 436 F.3d at 812. It is not sufficient for Finlay to raise "debatable points." *Sisto v. Ameritech Sickness & Accident Disability Benefit Plan*, 429 F.3d 698, 701 (7th Cir. 2005).

One aspect of a decision's reasonableness is whether the plan administrator operated under a conflict of interest. *Glenn*, 554 U.S. at 112–15; *Marrs v. Motorola, Inc.*, 577 F.3d 783, 787–89 (7th Cir. 2009). The weight an alleged conflict of interest receives depends on the "*likelihood* that the conflict of interest influenced the decision." *Marrs*, 577 F.3d at 789 (emphasis in original). The Seventh Circuit instructs courts to determine "the *gravity* of the conflict, as inferred from the circumstances." *Id.* (emphasis in original). The significance of a conflict may be reduced if "the administrator has taken active steps to reduce potential bias and to promote accuracy." *Id.* at 788 (quoting *Glenn*, 554 U.S. at 117). The court first considers the arguments based on the

administrative record and then turns to evidence of a conflict of interest.

**A. Procedural Issues**

Finlay takes issue with what he calls "Rose's brief," a document prepared by Beam's general counsel, Kent Rose, for the Employment Benefits Committee, that contains a summary of relevant facts, and the parties conflicting positions regarding Finlay's right to severance pay. A.R. 9–15. Finlay contends Rose acted as "prosecutor," advocating only for the company's position. A review of Rose's brief belies this characterization and contrasts this case from the situation in *Mohamed v. Sanofi-Aventis Pharmaceuticals, Inc.* There, the plan administrator relied solely on a memorandum prepared by company employees containing only the company's position, omitting all reference to the claimant's side. No. 06 Civ. 1504, 2009 WL 4975260, at *14–15 (S.D.N.Y. Dec. 22, 2009). To the contrary, Rose's brief contains a summary of Finlay's position on why the cancellation of his severance payments was unwarranted. On appeal, MacKenzie considered the nine-page letter Finlay's attorneys submitted, contesting the conclusions of the committee. A.R. 71–79. Unlike *Mohamed*, Finlay's position was before the plan administrator.

Finlay contends Beam never provided him with the information he requested about the evidence and documents the committee relied on in denying him benefits, hindering his ability to prepare his appeal. Finlay cites no evidence that he requested the documents, records, and other information relevant to his claim for benefits until his November 3, 2010 letter appealing the committee's denial. A.R. 71–79. Beam provides evidence that the information was emailed to Finlay's counsel by a Beam lawyer on November 22, 2010. Def. Resp. to Pl. Facts ¶ 15, Ex. F to Ex. 1. The contention that Finlay did not receive the information in time to amend his appeal

before MacKenzie issued a decision on February 28, 2011, is contradicted by the undisputed record.

**B. The Plan Administrator's Findings**

The plan administrator gave four reasons for termination of Finlay's severance benefits. Finlay attacks each one as unsupported. The court addresses each factor in turn.

**1. Failure to cooperate in the Cyron litigation**

The plan administrator found that Finlay failed to cooperate in the Cyron litigation by not signing a witness statement admitting that he informed Beam management on several occasions that Cyron would not relocate. She credited the statements of Newlands, Beam's US president, Pramberger, senior vice president of human resources at the time of the restructuring, and Shattock, Beam's president and CEO, that Finlay did in fact tell them Cyron would not relocate. These statements constitute sufficient evidence in support of her finding that Finlay's refusal to sign the statement was unwarranted.

Finlay asserts that Rose's brief misstates the nature of the disagreement between himself and Strehle about Finlay's witness statement. Finlay asserts he does not dispute that he told Beam managers that he believed relocation would be a potential issue for Cyron. He disputes that he had discussions with Cyron in which she confirmed her unwillingness to relocate. He contends that Rose's brief is inaccurate in focusing on a supposed disagreement regarding whether he spoke *about* Cyron to Beam senior management, but the true issue is whether he spoke *with* Cyron. This position conflicts with Finlay's position on administrative appeal: "Contrary to your letter, Finlay did not tell Beam senior management on several occasions that Anne Cyron would not relocate to the United States." A.R. 71. Finlay's distinction between stating his *belief* that Cyron would not

relocate, rather than a *certainty* that she would not, is too narrow a semantic distinction to find error in the plan administrator's factual determinations. The appeal admits to one occasion in which Finlay stated that relocation was "a potential issue" and another in which he stated "his opinion that Cyron might not be 'relocatable' to the US at that time." A.R. 71–72. It was not arbitrary and capricious for the plan administrator to credit the witness statements that Finlay spoke of Cyron's unwillingness to relocate several times during management's restructuring discussions. A.R. 243.

Similarly, Finlay focuses on an immaterial error in Rose's brief and the administrative record about whether he attended a meeting in Philadelphia about restructuring. It is established at this point that Finlay did not attend the meeting, but Rose nonetheless mentions this as a point of contention between Finlay and Strehle. Two witness statements from Newlands in the administrative record contain contradictory information about Finlay's attendance. This factor was not relied upon in either the initial claim denial or the subsequent appeal. The plan administrator did not cite Finlay's denial of attending the Philadelphia meeting; rather she relied on the witness statements that swore Finlay said several times that Cyron was not relocatable. Nor did Finlay raise an issue about the Philadelphia meeting on appeal after receiving the Rose brief.

**2. Finlay's dishonesty**

The plan administrator found that Finlay was dishonest when he insisted that he had not told Beam management on several occasions that Cyron would not relocate. Finlay contends he was never dishonest with Beam. He asserts he always shared his "belief" that Cyron would not relocate but never said definitively Cyron would not move. However, the administrative record

contains Newlands' statement that Finlay "stated definitively that Anne was a solid performer but was unable to unwilling to transfer to the US," and Pramberger's statement that "[i]n several conversations throughout 2008 and 2009, [Finlay] indicated that [Cyron] was a strong performer who could add significantly to Company initiatives, but that relocation to the US was not feasible." A.R. 44, 52. On appeal, the plan administrator credited these statements; Finlay has not pointed to evidence to the contrary that she overlooked in the administrative record. A.R. 246.

**3. Finlay's obligation to speak with Cyron about relocation**

The plan administrator concluded that if it was true that Finlay did not formally speak to Cyron about relocation, this was a failure to perform his job duties sufficient to constitute cause for termination of his severance benefits. Finlay's argument that there is no evidence he was obligated, instructed, or expected to confer with Cyron about relocating focuses only on proving he was not Cyron's direct supervisor at the time of the restructuring. His argument ignores the plan administrator's determination on administrative appeal that Finlay was involved in several discussions about the need for an employee in Cyron's position to be based in the United States. The plan administrator determined discussing relocation with Cyron was central to Finlay's job as the chief marketing officer; not asking Cyron about relocation, as Finlay contends happened, is a failure to do his job. Focusing on minor discrepancies about when Finlay stopped supervising Cyron does not raise an issue of disputed *material* fact.

**4. Finlay's misconduct**

The plan administrator determined that Finlay's conduct in misleading senior management about Cyron's unwillingness to relocate gave rise to her lawsuit against the company. Management relied on Finlay's statements during its restructuring discussions, contributing to the

decision not to consider Cyron for virtually the same position in the United States. Finlay contests this finding, arguing that he is a scapegoat for Beam management's failure to conduct the redundancy consultation required under UK law—a process that he contends should have occurred regardless of any statements he may have made about Cyron's availability to relocate. Finlay challenges causation: his alleged conduct could not, as a matter of law, have excused Beam management from conducting the required redundancy consultation. Legal determinations about Finlay's liability in the UK litigation are not at issue here. It was not unreasonable for the plan administrator to conclude that Finlay's misleading statements were a substantial factor in Beam management's subsequent denial of a job opportunity for Cyron that would require relocation.

**C. Conflict of Interest**

Cyron sued Beam and several Beam executives, including Newlands and Strehle, for discrimination. Pl. Facts ¶ 3. Beam's defense to that lawsuit relies on Finlay's statements that Cyron was unwilling to relocate. *Id.* If the Employment Benefits Committee on initial review or MacKenzie, the plan administrator, on appeal agreed with Finlay's position, that decision could have implicitly discredited Beam's defense to the UK lawsuit. Rose's participation in the benefits review process implicates a possible conflict of interest because, as Beam's general counsel, he was also involved in strategy concerning the Cyron lawsuit. *Id.* ¶ 1. Although MacKenzie was not named in the lawsuit, her direct supervisor, Beam CEO Shattock, was. *Id.* ¶ 3.

Beam fails to fully grapple with this conflict. It relies on *Comrie v. IPSCO, Inc.*, 636 F.3d 839, 841–42 (7th Cir. 2011), for the proposition that if committee members determining benefits under a pension plan for top executives are in the same position as the claimant, they are also participants in the plan with interests aligned to the claimant. These aligned interests lessen any

conflict of interest they might have. *Id.* However, *Comrie* is inapposite. There, the committee was interpreting the plan's "bonus" exclusion and the executive decisionmakers would have personally benefitted if they supported the claimant's proposed plan interpretation. *Id.* It was because of this personal benefit that their interests were aligned. Finlay challenges factual findings, not interpretation of plan terms. Beam has not explained how the interests of the Employment Benefits Committee and Finlay were aligned as to the determination of factual issues.

Beam argues that reinstating Finlay's benefits would not have jeopardized Beam's litigation status in the United Kingdom. Beam asserts an administrative decision in Finlay's favor "would simply have been a finding that the Company did not have grounds to terminate Finlay for 'cause,' as defined in the Severance Plan." Def. Reply at 10. It is possible that a favorable finding for Finlay could have been made without touching on issues in the UK lawsuit. For example, the plan administrator could have accepted Beam's version of events but still found those circumstances did not constitute "cause" under the plan. But that is not what happened. The plan administrator decided between two conflicting factual scenarios. One supported Beam's theory of defense in the UK litigation, the other directly contradicted it. Beam fails to acknowledge or address the substance of the conflict of interest issue.

That being said, a conflict of interest is only one factor to consider when deciding whether a plan administrator's decision is arbitrary and capricious. A conflict of interest becomes determinative if the other considerations are closely balanced. *Glenn*, 554 U.S. at 117. But here, Finlay's other arguments are unsupported by the record. Assuming that a conflict of interest existed, it does not tip the balance in Finlay's favor. Finlay has no evidence that a conflict

actually affected the administrative process. He relies on speculation that institutional pressure influenced the decision. The record is devoid of any evidence that would support a reasonable inference that the plan administrator's decision was improperly influenced.

**IV. ERISA Counterclaim**

Judgment is granted to Beam on its ERISA counterclaim to recover the severance plan benefits paid to Finlay. The severance plan's forfeiture provision created an equitable lien by agreement in the event that Beam's obligation to make payments was terminated for cause. *See Gutta v. Standard Select Trust Ins. Plans*, 530 F.3d 614, 620–21 (7th Cir. 2008). As discussed above, Finlay has failed to raise a genuine issue of material fact as to whether the plan administrator's determination of cause was arbitrary or capricious. The finding of cause applies to the forfeiture provision as well. Finlay does not contest the amount he has received in severance funds. Pl. Resp. to Def. Facts ¶ 43. Accordingly, $372,973 is subject to forfeiture.

**V. Conclusion**

Under the arbitrary and capricious standard, there is no genuine dispute that the plan administrator reasonably determined "cause" existed to terminate Finlay's severance payment and demand return of previous payments. Summary judgment is granted to Beam on Finlay's ERISA claim and on Beam's ERISA counterclaim. Beam's breach of contract counterclaims are dismissed without prejudice for lack of independent federal jurisdiction.

ENTER:

Suzanne B. Conlon
United States District Judge

May 30, 2012